1   STEVEN G. KALAR
    Federal Public Defender
2   DEJAN M. GANTAR
    Assistant Federal Public Defender
3   55 South Market Street, Suite 820
    San Jose, CA 95113
4   Telephone: (408) 291-7753
    dejan_gantar@fd.org
5
6   Counsel for Defendant
7   VAN-SEYLA MORK
8
9              UNITED STATES DISTRICT COURT
10            NORTHERN DISTRICT OF CALIFORNIA
11                   SAN JOSE DIVISION
12
    UNITED STATES OF AMERICA,          Case No. 18 Cr. 578 EJD
13
                Plaintiff,
14                                      DEFENDANT VAN-SEYLA MORK'S
         v.                             SENTENCING MEMORANDUM
15
    VAN-SEYLA MORK,                     Date: December 16, 2019
16                                      Time: 1:30 p.m.
                Defendant.              Location: Courtroom 1, 5th Floor
17
                                        Before the Honorable Edward J. Davila
18                                      United States District Judge
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Defendant Van-Seyla Mork ("Seyla"), by and through his counsel, respectfully submits the following Sentencing Memorandum.  Seyla comes before the Court having pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Probation calculates an advisory Guidelines range of 33-41 months, and recommends a downward variance to 12 months custody.  *See* Presentence Report ("PSR") Recommendation at 1.  The Government will recommend 27 months.

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a), Seyla respectfully asks the Court impose a sentence of five years probation, with the obligation he pay $1,000,000 in restitution, and perform 1,000 hours of community service ("the recommended sentence").  (Alternatively, in the event the Court finds a custodial sentence necessary, Seyla respectfully asks the Court impose six months custody, followed by two years of supervised release with the condition he serve six months home confinement.)  The recommended sentence is "sufficient, but not greater than necessary" to account for Seyla's circumstances, and his conduct and role in this case.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

**ARGUMENT**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).  "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime."  *Id.*  The Court is thus charged to "impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for

1

the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant." *Kimbrough*, 552 U.S. at 101 (quotation marks omitted; emphasis added).

**A.     The history and characteristics of Van-Seyla Mork.**

Section 3553(a)(1) directs the Court to evaluate "the history and characteristics of the defendant."  Van-Seyla Mork comes before the Court as a 25-year-old man from Holland, Michigan.  PSR at 3.  He is part of an exceptionally close-knit family who, despite the instant offense, has maintained their unwavering emotional support for him.  *See* Ex. A, Letters of Support; Ex. B, Family Photos.  Being the youngest of seven siblings, he is still today considered the "baby" of the family.  Ex. A, Sopheari Mork Letter, Heng Van & Sophy Mork Letter.  Born in 1994 to Heng Van and Sophy Mork, both refugees of Cambodia, he grew up in Michigan.  PSR ¶ 53.  His parents kindly describe him as "the quiet one[,]" who was always "cherished," and never asked anything of anyone.  Ex. A, Heng Van & Sophy Mork Letter. Seyla's family life growing up was stable and intact, and during high school, he participated in sports, and various extracurriculars which included reformatting computers and donating them to schools in Cameroon, Africa. PSR ¶ 54.

After high school, Seyla moved out of his parents' home, and enrolled at Kalamazoo Valley Community College, later transferring to Western Michigan University.  *Id.* ¶ 17.  Ex. A, Heng & Sophy Mork Letter.  During that time, Seyla moved in with his sisters, one of whom had just had a child.  Ex. A, Sokhotey Mork Letter.  Graciously, Seyla helped with caring for the newborn, while still attending school and working part-time.  Ex. A, Vannari Mork Letter. This type of generous support toward his family was common for Seyla.  *See generally,* Ex. A. Indeed, when he "wasn't at school or working at his part-time job, he would spend his

weekends helping babysit" his niece.  Ex. A., Sopheari Mork Letter.  Despite the instant

offense, Seyla has remained committed to his studies and future employment, and recently

graduated college with the indictment "looming over his head[.]"  Ex. A, Vannari Mork Letter.

His next life goal is to start a career, PSR ¶ 57, which in light of the instant offense, will be

difficult to say the least.[1]

As reflected in the many letters of support submitted on his behalf, Seyla is fortunate to

receive tremendous support from those closest to him.  *See generally* Exs. A & B.  A common

thread runs through those letters: he is peaceful, kind, caring, and selfless.  *See generally* Ex. A.

The letters equally reflect how outside of his character the conduct at issue was for Seyla.  As

his brother-in-law, Richard, writes, "Seyla would be the last person I would ever have expected

to have write [such a] letter for."  Ex. A, Wcislak Letter.  So too, his family shares the belief

that his unexpected conduct was the result of this young man's "drive for self-reliance[,]" Ex.

A, Wcislak Letter, and wish to not burden his parents financially.  PSR ¶ 59.  Collectively, the

letters also speak volumes to the remorse and shame Seyla feels for his offense conduct; not

only because it's impacted him personally, but also his family.

Like any committed parents, Seyla's wonder whether *they* could have done something

differently to have prevented his conduct.  Ex. A, Heng and Sophy Mork Letter.[2]  Reflecting on

---

[1] Before the offense, Seyla initially planned to embark on a career in aviation.  PSR ¶ 63;
PSR Sentencing Recommendation at 2.  As his brother-in-law Richard aptly notes, that will be
"challenging" at best.  Ex. A, Wcislak Letter.  So too, the Court is well aware that individuals
convicted of felonies struggle to secure and maintain gainful employment long after their release
from prison as a result of the general reluctance of private employers to hire ex-convicts.  Harry
J. Holzer, *et. al.*, *Will Employers Hire Ex-Offenders? Employer Preferences, Background
Checks, and Their Determinants*, Berkeley Program on Housing and Urban Policy, Working
Paper Series (2001).  Seyla emphasizes this point because, as the Second Circuit has previously
noted, "[i]t is difficult to see how a court can properly calibrate a just punishment if it does not
consider the collateral effects of a particular sentence."  *United States v. Stewart*, 590 F.3d 93,
141 (2d Cir. 2009).

[2] Seyla's parents are not native English speakers; accordingly, his sister, Kanhaka Mork,
assisted with the preparation and translation of their letter of support.

3

their sadness for their son's circumstances, they write that "[they] felt that [they] had failed to help when he had needed [them] most." *Id.*   Nonetheless, they express their unwavering support for their son. *Id.*

His rigorous drive for independence led Seyla before the Court today. Whether that drive resulted from culture, immaturity or poor-decision making, it doesn't excuse his conduct—but it does divide it from other fraud cases where defendants were motivated by greed or desire to live beyond their means. Without question, one need look beyond the offense conduct to find the proof of Seyla's high character. Richard's words are clear and strong: "I would place my family's future in his hands, knowing they are good." Ex. A, Wcislak Letter.

**B.      The nature and circumstances of the offense.**

Section 3553(a)(1) also directs the Court to evaluate the nature and circumstances of the offense. In 2015, when he was only 21, Seyla posted a communication on www.mpgh.net, advertising an "Apple Refund Service." PSR ¶ 13. The advertisement offered full refunds for individuals that had recently purchased Apple products, in exchange for a fee of 10% on the purchase price. *Id.* ¶ 10. Several individuals replied to the ad, *id.* ¶ 11, and over a period of approximately three years, Seyla sought and obtained refunds for several such individuals, causing Apple to issue $1,000,000. *Id.* ¶¶ 13-14. In short, Seyla contacted Apple customer service on behalf of those individuals, and claimed that their purchased products had not been received, and requested refunds. *Id.* ¶¶ 12, 16.[3] Throughout this period, Seyla transferred proceeds he obtained to his co-defendant (and girlfriend), Robing Tran and others, using Venmo and Paypal. *Id.* ¶ 15.

---

[3] The individuals on behalf of whom he acted were willing participants: Seyla informed them of the fraudulent nature of their refunds. PSR ¶ 11. Moreover, Seyla did not devise the scheme; "he saw other people on various message boards conducting" it, and tried it. PSR ¶ 27.

On September 11, 2018, the FBI arrested and interviewed Seyla. *Id.* ¶ 16. Seyla immediately confessed and explained that he learned how to conduct the scam from another user's post on www.mpgh.net. *Id.* ¶ 16. He also agreed to the immediate seizure of his virtual currency, which totaled approximately $9,000. *Id.* ¶ 21.

Apple products are not cheap. As such, the loss amount at issue in this case is high: $1,000,000.[4] Seyla, however, received approximately $100,000, which he used to pay for college tuition. *Id.* ¶ 20.

None of this is laudable. But it is—as described by his family, *see* Ex. A—a reflection of Seyla's immaturity, strive for independence, and desire to not be a burden on his parents. So too, the money Seyla obtained from the conduct is a small fraction of the total loss amount, the rest of which, went to the many unindicted co-conspirators. But of course, it is the total loss amount that drives the advisory Guidelines range in this case; were they decided by the amount Seyla actually *received*, his advisory range would be 15-21 months.

Seyla's "motive for committing the offense is one important factor" in determining the correct sentence. *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993). As such, the Court should consider the fact that Seyla used the money to pay for college tuition in an effort to not burden his parents—as opposed to buying luxury items or living beyond his means. Again, Seyla in no way seeks to excuse or diminish the offense conduct, but as one district court has noted, "[w]ith their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability." *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005). And the remorse and guilt Seyla now carries as a result of this offense is salient. As is his

---

[4] Notably, Reuters reported in 2017 that the iPhone X cost the company $357.50 to make, but at the time was selling for $999.00, *i.e.*, a 64% markup. *See* https://www.reuters.com/article/us-apple-iphone/apples-iphone-x-has-higher-margin-than-iphone-8-analysis-idUSKBN1D62RZ?il=0.

acceptance of responsibility, which was demonstrated even at his arrest, when Seyla candidly admitted to the conduct, described it to authorities in detail, and agreed to the immediate forfeiture of his funds.[5]  In sum, Seyla respectfully contends that section 3553(a)(1) supports the recommended sentence.

**C.      The recommended sentence would serve the additional section 3553(a) goals.**

Section 3553(a)(2) directs the Court to evaluate a sentence sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment most effectively.  The Court should fashion "a sentence sufficient, but not greater than necessary" to meet these goals.  *Kimbrough*, 552 U.S. at 101.  Below, Seyla describes why the recommended sentence would satisfy those goals.  *See* Part C.1.-C.3, *infra*.

Sections 3553(a)(3)-(4) direct the Court to assess the kinds of sentences available statutorily and under the Sentencing Guidelines.  Importantly, this section gives effect to *Kimbrough's* directive for the Court to consider the Guidelines like the rest of the section 3553(a) factors.  Statutorily, Seyla is subject to a term of incarceration up to 20 years, 18 U.S.C. §§ 1343 & 1956(a)(1)(B)(i), and a probationary sentence of not less than one, and not more than five, years.  18 U.S.C. § 3561(c)(1).

---

[5] His guilt was compounded by the fact that his girlfriend, Ms. Tran, with whom he still in a committed relationship, was indicted as well—following his arrest, Seyla sought to break up with her because of his guilt, but she and her family "have decided to stand by him[.]"  Ex. A, Vannari Mork Letter.

As for the Guidelines, Probation calculates Seyla's total offense level at 20.  PSR 71.[6]
He falls in Criminal History Category ("CHC") I, resulting in an advisory Guidelines range of
33-41 months.  Notwithstanding the advisory Guidelines in this case, Seyla respectfully asks this
Court vary downward and impose the recommended sentence.  A custodial sentence would
serve little purpose beyond retribution—Seyla respectfully contends that the deterrent and
rehabilitation goals of section 3553(a) will be fully satisfied by a probationary term, combined
with significant community service and restitution.  And this Court can reinforce the deterrent
impact by sternly advising him of the Court's authority to impose a significant prison sentence
in the event he violates the conditions of probation.[7]  *See United States v. Autery*, 555 F.3d 864,
876 (9th Cir. 2009).

> **1.** **Seyla's youthfulness and immaturity at the time of the offense, and complete lack of criminal history support a downward variance.**

Multiple factors support Seyla's request for a downward variance.  As an initial matter,
Seyla was (and still is) a young man when he committed the offense.  As the Supreme Court has
acknowledged, "youth is more than a chronological fact.  It is a time and condition of life when
a person may be most susceptible to influence and to psychological damage."  *Gall v. United
States*, 552 U.S. 38, 58 (2007) (internal citations omitted).  Moreover, the Court has recognized
that immaturity is a reasonable basis for a significant downward variance.  *Id.* at 58.[8]

---

[6] The total offense level agreed to in the plea agreement is 18.  ECF 17 at 6.  The resulting advisory range, based on that calculation, would be 27-33 months.  In an effort to comply with the terms of the plea agreement, Seyla takes no position on Probation's calculation.

[7] This Court may impose any sentence available at the time of original sentencing in the event of a probation violation, up to the statutory maximum.  *United States v. Plunkett*, 94 F.3d 517, 519 (9th Cir. 1996).

[8] Recent neuroscience research shows that the human brain continues to develop until about age 25.  *See* Sandra Aamodt, *Welcome to your Child's Brain* (2011); Interview with Jay Giedd, PBS Frontline (2014), available at:

So too, Seyla has no criminal history whatsoever, making a probationary sentence all the more appropriate. *See United States v. Paul*, 239 Fed App'x. 353 (9th Cir. 2007) (unpublished) (finding that sixteen month within-Guidelines sentence was unreasonable in part because the defendant was "a first-time offender with absolutely no criminal record whatsoever[.]")  But the Guidelines fail to reflect his complete lack of criminal history. *See Autery*, 555 F.3d at 874. "[A] defendant with a minor criminal history can still fall within [CHC] I." *Id.*  Put differently, Seyla falls into CHC I, the same level that a hypothetical offender with *some* criminal history would fall into; a downward variance appropriately accounts for this. *Id.*  Indeed, Congress acknowledges "the general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence[.]"  28 U.S.C. § 994(j) (emphasis added).   Such is the case here.

**2.    Seyla's personal characteristics and strong social support network.**

Additionally, the Guidelines fail to consider Seyla's otherwise strong personal character—"having no history of substance abuse, no interpersonal instability, [and] no sociopathic or criminalistic attitude[.]" *Autery*, 555 F.3d at 868.  So too, his general good character, which includes his dedication to his family, and commitment to steer himself toward the right path, obtain gainful employment and make payments toward restitution as ordered by this Court, are all reasons to vary downward.

Many defendants who appear before this Court lack the strong social support networks to guard against recidivism.  But, as reflected in the letters of support, Seyla maintains such a strong support network.  And Seyla's words of remorse clear: "Most of all[,]" he feels "very

---

https://www.pbs.org/wgbh/pages/frontline/shows/teenbrain/interviews/giedd.html; *See also*, Skye Gould & Erin Brodwin, *The Age Your Brain Matures at Everything—It Isn't Even Fully Developed Until Age 25* (2017), available at: https://www.businessinsider.com/age-brain-matures-at-everything-2017-11.

8

ashamed for committing crimes against the same country that ha[d] generously taken in [his] parents as refugees and [] allowed them to live here without them having to worry about their lives being threatened back in their home country."  PSR ¶ 26.

### 3. The recommended sentence will adequately further deterrence and rehabilitation, guard against recidivism, and enable restitution.

The likelihood that a defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper,* 562 U.S. at 492.  As part of the sentence, the Court will impose a $1,000,000 restitution award—the Government can hardly dispute Seyla's position that this alone serves a significant deterrent effect.[9]  But a five-year probationary term would also *enable* Seyla to continue working—or better, search for more stable and long-term employment opportunities—and permit him to make payments toward "the significant amount of restitution he owes." *United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010).  And "[s]ection 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration." *Id.* at 1016.  Moreover, the evidence reflected in the PSR and letters of support indicates Seyla is unlikely to reoffend or harm the public, and so a custodial term would not further that goal.

At bottom, the conditions of probation will be onerous, and the consequences for violating them great.  And as the Ninth Circuit recognized, a community service requirement would satisfy the goals of section 3553(a)(2)(D). *United States v. Vega*, 545 F.3d 743 (9th Cir. 2008).  Equally important is that society in general would benefit far more from Seyla's significant community service and restitution payments, than it would from a custodial sentence. For the foregoing reasons, Seyla respectfully asks the Court impose the recommended sentence.

---

[9] The restitution order alone is a significant sentence.  While the ultimate impact of the $1,000,000 loss to Apple is insignificant to the company, the restitution amount is enormous for Seyla.

**D.      The recommended sentence would not result in an unwarranted disparity.**

Section 3553(a)(6) directs the Court to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  Seyla respectfully contends that the recommended sentence would not result in an unwarranted sentencing disparity as described by this section.  Various defendants under similar circumstances have received sentences comparable to the recommended sentence.  *See e.g., United States v. Perez*, Case No. 13 Cr. 691 (N.D. Cal. 2013) (defendant convicted of wire fraud causing over $1,000,000 loss sentenced to five years probation); *United States v. Shryock*, Case No. 14 Cr. 10130 (D. Kan. 2014) (defendant convicted of mail fraud resulting in over $1,000,000 loss sentenced to probation); *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (defendant convicted under the Digital Millennium Copyright Act for selling over $1,000,000 of counterfeit satellite feed access cards sentenced to probation); *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2013) (defendant convicted of mail fraud and conspiracy to defraud the government, resulting in over $5,000,000 loss sentenced to three years probation, 1,000 hours community service, and six months home monitoring).

## CONCLUSION

For the foregoing reasons, Van-Seyla Mork respectfully asks the Court to impose the recommended sentence.

STEVEN G. KALAR
Federal Public Defender

DATED: December 9, 2019                     */s/ Dejan M. Gantar*
                                            DEJAN M. GANTAR
                                            Assistant Federal Public Defender

                                            Attorneys for Defendant
                                            VAN-SEYLA MORK

# EXHIBIT A

Thavisit Dallas Saycocie



10/26/2019

RE:  United States v. Mork, Case No. 18 Cr. 578 EJD

To: The Honorable Judge Davila

I have known Van-Seyla as a good friend for over fifteen years, we have lived in the same neighborhood our whole childhood, went to the same school district from middle school to graduating high school, and survived college together  . I was both uneasy and surprised to hear about his recent case as he always been a very honest person. It is for this reason I am elated to write a letter of reference for Van-Seyla.

Van-Seyla is a thoughtful person, he has shown kindness in our friend group when we decide to drink alcohol while having a get together at a friend's home. Van-Seyla does not drink that much, usually one shot of liquor to start off the night and he is then taking care of everyone during the night.Van-Seyla is a great member to society, He has the ambition and drive to contribute to society and I feel that he will still be a great member to society to the best of his capabilities after this case is over. When I heard of this case from Van-Seyla I thought this was so out of character for him and he will not commit this offense again. Van-Seyla experience throughout this case has taught him some valuable experience with the importance of making honest money. There is no quick easy way to make money through dishonest actions.

Van-Seyla and I have gone through many hardships together financially and academically, I cannot count the number of sleepless nights we had with staying up together doing homework, having early classes in the morning, scheduling classes condensed to 6 weeks than 12 and during the summer and working while going to school to pay the difference between what scholarships cover and the rest of school.

I know Van-Seyla has done wrong by commit refund fraud with Apple and stealing from Apple but I do believe Van-Seyla is a good person.

Sincerely,

Thavisit Dallas Saycocie

Dear Your Honor,

My name is Sokhotey Mork.  I am Van Seyla's oldest sister.  I am writing this letter in support of my brother's character.  I know that my brother committed the crime whilst living in my house during college.  My husband and I were shocked when everything started to come to light during the raid.  My brother has been very dependable and an asset to our family while living with us.  He was our main babysitter for our only child.  She is now 5 and was watched by Seyla starting at nine months of age.  I was in nursing school and working nights.  My husband held two jobs so Seyla became another caregiver to Lora.  He was and is still very thoughtful and kind.  Always asking us if we needed anything or how he can help.  My brother though has a hard time asking for help for himself.  He wanted to do everything on his own. I believe this is what led him to commit those crimes involving money; he used the money for school tuition. We didn't see this going on, because he didn't buy flashy items or had expensive purchases. My brother doesn't drink or used recreational drugs.  I know my brother will not commit this type or any crimes in the future.  He sees the anxiety and fear that we all as a family have with what is going on with him and his future.  After the FBI raid, my brother has become more open with his feelings.  I see regret, fear, and remorse.  I see my brother for the first time a vulnerable person, but I also see inner strength.  He graduated college and is now working in manufactory through a temp agency.  I see humbleness.  We grew up in a manufactory company.  Our parents made car parts in a factory.  Van Seyla never wanted to do any of this, but now he is at one.  He is working at some food factory where he smells of vinegar.  We joke about the smell, but he says he is doing well there.  I am proud of my brother for trying to better himself and not giving up.  He is a productive member of society.  He knows now that money comes from hard work; he is working hard for it now.  I love my brother.  Our family will be his biggest support.  We will be there for his sentencing.  Regardless of what happens, Van Seyla has a strong support system waiting for him.  Thank you for taking the time to read this.


Sincerely,

Sokhotey Mork

10/26/19

October 22nd, 2019


To Honorable Judge Edward J. Davila

San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street, San Jose, CA 95113,


Dear Honorable Judge Davila,


My name is Vandara Mork and I am the 6th Mork of the 7 as well as the oldest son. I am 27 years old and am currently employed as an assembler at Central Texas Iron Works. Seyla is my youngest (and only) brother and I still see him as such.

I remember during my childhood we would play outside and do stupid things that kids do, I would always argue with him about which fictional character could beat who, which of us were better at any given task or who could dominate in video games. As we grew into our teens this dynamic changed a tad, we still discussed video games and tv shows and generally got along, but as people we were very different, I had middling grades, but was bigger and stronger and my social circle was everywhere, he had significantly better study habits which led to being better at academics, and his group of friends were more into sports and general athleticism.

As I left the house to attend college, I still tried to keep in touch, I found out over the years that he joined the recently formed rugby team of our highschool and they won the state championship, a feat that brings me much joy to know he had a part in it, and we surprisngly discovered and enjoyed the same shows and games organically from eachother.

When it was his turn to have the college experience, I was genuinely surprised and taken a back, where most would cave in and go out drinking , partying and general gallivanting; he would just stay at home for a quiet night, something you wouldn't expect from someone in the prime of youth.

This entire debacle regarding his wire fraud charges with Apple has put his whole life on hold, he acts as if he's taking it in stride, but I know that he is struggling with how he's going to rebuild everything once he's served his time, there is no doubt in my mind that if he could do it all over again that he would find a better way as opposed to choking on remorse.

In conclusion, despite what he's done to land himself in this situation, I still love him as my little brother, through out his life he has been of resolute character and solid integrity, he has chosen prudence despite the bawking of those who would have him do otherwise and refuses to let the pressure of his peers influence his path. I will continue to support him in the coming days and beyond and look forward to having this all behind us in the happier times to come.

Sincerely,

Vandara Mork

Your Honor,

My name is Vannari Mork and I am Seyla's 4th oldest sister out of 7 siblings. I am 30 years old and work as an accountant in the Pacific North West. Seyla is my youngest brother and has always been considered the baby of the family.

My earliest memories of Seyla and my fondest ones are when he was around 3-5 years old. A high pitched scrawny little boy with a gap between his two front baby teeth and the stereotypical bowl cut hair style. Because of the age difference we never really confided in one another about anything nor did we have too much in common at that time. But we did have 2 siblings between our ages, Sopheari and Dara, whom helped bridge that gap, so we did play together a lot in our early childhood.

While we naturally grew apart during our younger adult years, we still remained emotionally close. To this day, we bond over video games and anime shows, which we both love. When I find myself looking for recommendations, I will still message him even though I'm 2,000 miles away and 3 hours behind. It might seem inane, but it means a lot when he responds with titles he knows I would be interested in. That to me, lets me know that he still remembers my preferences and even though we don't have the same taste in genres he takes notes for me.

After Lora was born (our niece born to our eldest sister Sokhotey and her husband Tim) we found ourselves roommates again. I had just graduated college and he was just starting. We all decided to move in together to help take care of the newborn and to help Seyla with his room and board. He worked part time as a server at "A Thai Café" (this was the actual sign in front of the restaurant) and went to school full time. On the weekends he would go out of town to see his girlfriend. During the week in his free time he mostly stayed in his room and played video games. Sometimes he would be asked to stay home and baby sit over the weekend. He's never fussed over this and we all adored Lora anyways. Seyla actually loves babies and he's really good with them. We still celebrate holidays and birthdays together as a family. And had dinner parties with friends and family often.

One thing I really commend Seyla for is that he was never interested in attending all the various college parties in Kalamazoo, which is definitely a "party town." Nor have I ever seen him have a drink, at least with me. He refused to even go out on his 21st birthday. I was very surprised. And I've never really seen him spend his money frivolously either. He stayed home a lot or went to this girlfriends house and stayed there.

All in all, Seyla is a sweet little brother. I genuinely enjoy his company and like spending time with him. He is always willing to be there when you need him. For example, I would often ask him to make a 3-hour drive from Kalamazoo to Chicago to pick me up from the airport, and he never gave me a hard time for it. And he's very docile; I've never even been in an argument with him. Seyla is really there for his family and friends, which means a lot. That's why we all support him even though he made a big mistake.

To no one's surprise, this case has seriously impacted Seyla. Yes, over a 5-year period he profited as much as $100,000.00, which he used mostly towards paying for school. During those

years he was actively attending school, working part-time, visiting friends and living with family. He wasn't living an extravagant lifestyle. After the fall-out and the FBI raid on his home I heard that he had driven straight to his girlfriend's house to break-up with her because of what had happened. She refused, and she and her family have decided to stand by him during this whole ordeal. Eventually he opened up to our sister Sokhotey, whom he was living with at the time, breaking down and telling her everything. I can just picture him in that moment. Feeling lost and alone, afraid of what was to happen next, and regretting everything he did to get there.

Even after being indicted, he still continued to work and go to school. He graduated this year from college even with everything looming over his head. He knows he messed up, and he is willing to accept the consequences for what he had done. Now all he wants is to serve his time and then move on with his life. Everything has been put on pause and the waiting is the worst part for him.

I would say our action as a family speaks more for his character than my essay can ever convey. Even though we're all years, miles and time zones apart, we're willing to drop everything to be by his side. He has earned our love and support by being who he is. Our little brother Seyla.

Sincerely,

Vannari Mork

Kanhaka Mork

████████████████

October 22nd, 2019

To Honorable Judge Edward J. Davila
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street, San Jose, CA 95113,

Dear Honorable Judge Davila,

My name is Kanhaka Mork. I am writing this letter to you in support of my brother Van Seyla Mork in *United States v. Mork,* Case No.18 Cr. 578 EJD.

I am Van Seyla's second eldest sister. My brother and I are 13 years apart. We come from a working class family of seven children. My older sister and I had the task of raising our younger siblings while our parents worked in the factory, so we are very close to one another.

Out of all of the siblings, my brother Van Seyla was the youngest. Despite being the baby of the family, he was very determined to be self-sufficient and self-reliant and not ask anyone for anything. He still was a very sweet kid though and was very considerate of others.

I left Michigan after I graduated college, my brother would visit often and I took every opportunity to mentor him. When he was still in high school, my husband and I would talk to him about our college experiences, share with him all of the majors and many interests out there. He was always interested, listening and asking questions. We would bring him to tour colleges and chat about endless career possibilities. We were very happy when he decided to take a path toward aviation – whether that be through the air force or through the aviation industry such as flight control or airport management.

From then, Van Seyla decided to attend Western Michigan University and we kept in touch here and there with him calling once in awhile needing some guidance with research papers and topics. He just did his own thing with his studies, working at a cafe and staying connected with high school friends.

When I became a stressed out, stay at home mom, my brother was my go to person. For the past three years without hesitation – my brother would fly over to help me out on a whim. He is a wonderful, patient and kind uncle to my son whom has autism. He gives so much love and support is always dependable and helpful. I know that anytime I feel overwhelmed and need help - my brother will always be there for me. He has helped my husband and I countless times – most recently with moving and driving my car across the country a couple times to help transport.

We were just completely surprised when we found out Seyla was charged with money laundering and wire fraud in regards to Apple Inc. The disbelief my siblings and I felt were ineffable. We have only known him to be a straight-laced kid. This is the kid that didn't smoke, drink or even allow his nieces and nephews to use profanity. Everything was always smooth sailing for him. Just a go with the flow kid. We were blindsided.

I felt guilt. I thought perhaps I wasn't there for him enough or perhaps I didn't ask him if he needed money for school and he had to resort to this. We were all at a loss and our parents were also out of the country. We knew that we had to all come together because in our hearts – our brother is a very kind person with a compassionate heart. This does not define him. He is not a horrible person despite this enormous mistake he had made. He has his whole life ahead of him. From the very beginning when he was convicted and charged, he asked us to not make excuses for him and to not have sympathy for him because this is his wrong doing and he will accept the punishment and take responsibility to do whatever he can to make it right. We told him that we will be with him through it all and that is what family does - we stick together.

Throughout all the support and encouragement we have given him such as telling him to look forward, push towards graduating, get a job and etc, he has expressed pain and guilt for the weight he has put on his family. I can honestly tell you my brother will never commit a crime of any kind after this because he told me the pain of putting his family through this anguish of uncertainty and the disappointment he has caused is unbearable and he would never do anything to cause such harm ever again. He doesn't believe we should be here for him and doesn't feel deserving of the love we have shown. I can only imagine the amount of guilt that floods his thoughts. I truly believe he is remorseful. Although this is his first offense – I am confident it will be his very last.

I hope this letter helps shed some light on my brother and our family background. Thank you for allowing me the opportunity to write you this letter.

Respectfully,

Kanhaka Mork

Heng and Sophy Mork



October 22nd, 2019

To Honorable Judge Edward J. Davila
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street, San Jose, CA 95113,

Dear Honorable Judge Davila,

My name is Heng Van Mork, and I am Seyla's father. This letter represents my views, and those of my wife, Sophy Mork.

Out of our seven children, Seyla is the youngest. As soon as he had graduated high-school and wrapped up his pre-requisite courses in community college, he moved to live with his sisters Sokhotey and Vannari in Kalamazoo. Upon transferring his credits over, he continued his education at Western Michigan University.

After he had moved out, my wife and I sold our home and retired to Cambodia. We would fly back to the US every other year or so to visit with our kids, family, and friends for a few months.

We now regret leaving him so soon. We feel like a part of this is our fault, and could have been avoided if we had stayed a few more years to help him financially through the rest of his college career.

He worked at a restaurant part time and lived with his sisters. He seemed happy and we weren't worried about him. Like most parents we constantly asked him if he needed money, and like most children, he would turn down our offer saying he was fine. Thinking back, he probably believed that being retirees, we were on a fixed income, and that we couldn't spare the extra cash. I don't know. But he never asked us for help.

Everything seemed fine. He was going to school, working, and living with family. He didn't smoke or drink. At least not in front of us, as some of his siblings eventually became comfortable doing as they grew into adulthood.

But then we got the call from our daughter, telling us what had happened. Our son was charged with defrauding the company Apple. That he was involved with wire fraud and money laundering for the past few years while he was in college. Our immediate emotional response was fear, followed by painful sadness.

Fear for what was going to happen to our promising young son. How it would affect his future that he spent the last few years working towards. And sadness, because we felt that we had failed to help when he had needed us most.

Growing up he had always been the quiet one. Generally kept his personal opinions to himself. Never caused waves. For the longest time he was the one we all cherished. My wife still calls him the baby of

the family. He wasn't spoiled and he never asked anything of us; unless it was a basic necessity like new clothes he needed, because the ones he had were wearing out. We never had to worry about him.

My wife and I know that our son regrets all of this. We see it in his face – the embarrassment and disappointment he has in his self. We know he will never do anything that hurts us, his brother, or sisters, like this again. We love him so much, and will always support him and be there for him. Yes, he did wrong and we will not dismiss how big of a mistake he made. How it will affect his future now with everything he was working toward. He is so young and has his whole life ahead of him. We worry every night what the outcome will now be – will he be someone that will have a hard time supporting himself, will he end up needing constant help or be dependent on others, will he live a life of struggling to pay bills?

There is not much else we can do. We will always support him. He made his mistake, and he will do everything to make it right. We can wish over and over that this never happened, or wish he wouldn't have choose to do something illegal, wrong, and hurtful to a company, or anyone, but he did. This is something he will have to face. There are consequences, and he will have to learn the very hard way now. No matter what, he is our son. We know that he has a good heart, and that this action doesn't define him. He will get through this and we will be there with him.

Thank you for taking the time read this and allowing us to share our thoughts.

Sincerely,

Heng Van Mork and Sophy Mork

Sopheari Mork



October 24,, 2019

To Honorable Judge Edward J. Davila
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street, San Jose, CA 95113

Dear Honorable Judge Davila,

My name is Sopheari Mork. I am writing this letter to you in support of my brother Van Seyla Mork in *United States v. Mork,* Case No.18 Cr. 578 EJD.

I am Van Seyla's 4th eldest sister. I am a bit closer in age to Seyla, only about 5 years apart. We grew up with six other siblings. We both are considered the babies of the family. Him the youngest son and I, the youngest daughter.

Growing up with a brother that was closer in age didn't feel like we had much of an age gap. He and I both did not like to cause any trouble and were more on the stricter side of things growing up. We learned from the mistakes of our older sisters have made and were careful not to make the same. Our parents were rather strict and limited our time out of the house. They were protective and wanted to make sure we made it into college. Having a strict upbringing meant having to stay home most days and not joining in on after school activities. Our outlets for social fun were video games, online games and phone calls to friends on the main homeline. If we weren't indoors, we were usually outside playing in our driveway or stomping around in the small woods next to our house.

I live in Michigan, went to college and was only 30 mins away from our home town. I would visit home often while my brother was in highschool. He would usually be in his room, playing video games. Since he was the youngest in the family, he was the last of the kids to be at the house. My brother is a pretty reserved and quiet person. Far different from the varying personalities of us other siblings. While most of us would jabber on and on, he would say what was needed and leave it at that. With having such a quiet demeanor, he worked very well with kids. The younger cousins would gravitate towards him to play and the nieces and nephews would follow suit. Whenever my sisters would need help with the kids, he would be available to lend a hand.

There was a time, after college, when I needed to move back home. My brother had left the house by then and was attending a community college and living his own life. I would only be in contact with him during family functions, get togethers with cousins or holidays. When he was over at our parents house, he would be in a room, playing some sort game with our cousins or our brother.  He never really asked my parents or me for anything. I really didn't ever think to ask him how life was or if he needed help with anything. I was too engrossed in my own life and not really being the big sister I should have been. I kind of just let my other older

sisters be the ones to take care of everything. Not realizing that I could have been of better support for my little brother.

My brother is ,socially, very different from the other siblings. While we like going to parties, out to the bars and drinking. He was more content staying in with his close knit group of home-town friends or his cousins. They would just have game nights, sing karaoke and cook lots of food. Seyla is very similar to my father in that way. They both have never wanted to join in those types of activities and they remain firm in their ways. I have always admired how he doesn't give in to peer pressure. Unlike the other siblings, my brother has always been a no thrills type of person and stays out of trouble. When my brother wasn't at school or working at his part-time job, he would spend his weekends helping babysit for my eldest sister, while she went to work, or he would help his girlfriend babysit.

I truly feel that my brother feels guilt and remorse for what he has done. He hasn't spoken much around me and I can see how much his actions have weighed him down. He still doesn't ask much from myself or my other siblings. I feel that he is ashamed and embarrassed to ask for any more help. I am upset with myself for not being as involved in his life as I should have been and feel like this could have been prevented. Our family has become closer from this and will always be fully supportive of Seyla.

Thank you for taking the time to review this letter and giving us the opportunity to let you know my brother as a person and the type of family life he is from.

Respectfully,

Sopheari Mork


_____
Sopheari Mork (Oct 24, 2019)

Richard Wcislak

October 22nd, 2019

To Honorable Judge Edward J. Davila
San Jose Courthouse, Courtroom 4-5th Floor
280 South 1st Street, San Jose, CA 95113

Dear Honorable Judge Davila,

My name is Richard Wcislak. I am writing this letter in regards to my brother-in-law Van Seyla Mork.

I've known Seyla for over 12 years now. His sister, Kanhaka, and I have been married for nearly 10 years. Over the years, I've watched him grow and develop. He's always struck me as a reserved individual, mature beyond his age, always respectful, and quick to help. Looking to my and my wife's families, Seyla would be the last person I would ever have expected to have to write this letter for.

Just recently we celebrated our child's third birthday with family in Indiana. I was travelling for work, and needed transportation from Detroit to Fort Wayne. Seyla was living in Kalamazoo. When my wife asked her brother if he could pick me up, he said that wouldn't be a problem. There aren't many who would be willing to drive two hours east to pick someone up from the airport, only then to drive another two and a half hours south, without some sort of coercion. And when my flight was diverted to Columbus, I jokingly told him to swing down there and pick me up. He was ready to, until I told him I was pulling his leg. I apologized for having him drive all the way out there for naught. Seyla's reply was "no problem, you and Kanhaka have done so much for me".

That's the kind of person Seyla is. He really is a genuine, caring, and selfless. Which is why it is so easy to reciprocate the relationship. While searching for colleges, he came down to Charleston where we were living, and toured the Citadel. We were, without a moment's hesitation, willing to take him in and support him while attending. I knew he wouldn't bring any stress into my life. There wouldn't be any need to berate him over helping around the house, turning down the music, excessive drinking and partying, and all the other headaches that come with many of that age. Myself included.

So it makes me wonder why he did this, something so out of character for him. In the end, I think it's his drive for self-reliance and independence that led to this lapse in judgment. With his parents overseas, my belief is that he did not want to ask for help from anyone to obtain student loans. So he turned to his wits and concocted a scheme to make money from a faceless, massive, corporate entity. Crime is easier if your victim doesn't have a face.

As credit to him, Seyla made no excuses, and he owned what he did. He knows that this incident will make his life much more difficult. Especially in the field of study of aviation that he had just completed. Becoming a felon makes life infinitely more challenging. I also work in aviation, and know is little tolerance for transgression. But the most important lesson or realization that he's come to is just how much his family cares for him.

Through this challenge, Seyla has seen the lengths his family is willing to go for him. We all joined together to help finance his legal and travel costs. I've been taking time off of work and flying out to California to attend court appearances with him. We have even begun conceptualizing a family business for Seyla to run, knowing that employment may become a challenge for him. If we believed that Seyla was ever going to relapse into crime again, that he was a lost cause, we wouldn't be so keen to help. If anything, I know this incident has opened his eyes to how much his family cares. No matter what hardship he may face, he has us there to support. I have faith in him. When we do get our venture off the ground, I would have no hesitation involving him. I would place my family's future in his hands, knowing they are good.

Thank you for taking the time to let me share my experiences with, and feelings for, my brother-in-law.

Sincerely,

Richard Wcislak

# EXHIBIT B







